David D. McKINNEY, Administrator of the Estate of Mary D. McKinney *v.* John W. UNGER

92-1123                                              853 S.W.2d 871

Supreme Court of Arkansas
Opinion delivered May 10, 1993
[Rehearing denied June 14, 1993.]

*Mary Thomason*, for appellant.

*Appellee*, pro se.

TOM GLAZE, Justice. Appellee John W. Unger, Jr. is the former attorney for the appellant, the Estate of Mary D. McKinney. The Estate was opened in May of 1986 and David McKinney, one of Mary's children, was appointed administrator, and Unger was retained as the Estate's attorney.[1] On January 26, 1988, Unger formally withdrew as the Estate's attorney and attorney George W. Mason, Jr. was named Unger's replacement. In March 1988, Unger filed a motion with the Union County Probate Court for attorney's fees in the amount of $12,850.00. Although the Estate responded by agreeing Unger was entitled to a reasonable attorney's fee, it denied through its new attorney that the amount requested was reasonable. One of the heirs of

---

[1] Unger had previously been retained by David McKinney, individually, to represent him in two separate lawsuits. At some point in time, undisclosed by the record, McKinney filed a legal malpractice action against Unger and his law partners.

Mary also denied the reasonableness of Unger's request and further asked that Unger be required to file an accounting of the estate's assets, which the court ordered on September 12, 1988. Two weeks later, Unger surrendered his license to practice law, and on November 11, 1988, he filed a Chapter 7 bankruptcy petition.

In his bankruptcy petition, Unger did not name the Estate of Mary McKinney as a creditor, but instead named the Estate as an "account receivable." David McKinney was listed as an individual creditor and, as such, David received notice of Unger's bankruptcy proceedings.

On June 20, 1989, Unger received an order of discharge from the bankruptcy court.[2] Nonetheless, the dispute between Unger and the Estate over Unger's claim for attorney's fees resurfaced in the state probate court on May 30, 1990. On that date, David McKinney, as administrator, asked the state probate court to require Unger to appear and show cause why he should not be held in contempt for not entering the accounting ordered on September 12, 1988.

On July 18, 1990, Unger filed an accounting listing $135,576.36 in receipts and $114,626.85 in disbursements, leaving a balance of $20,949.51. Unger claimed $19,130.36 was owed him in attorney's fees for work done for the Estate and David McKinney, individually, and stated the balance, $1,819.15, was owed the Estate. On September 17, 1990, the probate court ordered Unger to deposit the $20,949.51 balance into the court's registry, but Unger objected, stating the probate court's order violated the bankruptcy court's discharge order entered on June 20, 1989.

Administrator David McKinney, on January 22, 1992, petitioned for body attachment requesting the probate court to order Unger to comply with its accounting order dated September 17, 1990. The probate court denied the Estate's petition, and in a letter opinion, explained it was without jurisdiction to order a body attachment because David McKinney, as administrator,

---

[2] A motion was filed in Unger's bankruptcy proceeding to set aside this discharge order, but on March 22, 1991, the bankruptcy court affirmed the June 20, 1989 order.

failed to make a timely claim in Unger's bankruptcy proceedings; therefore any monies or debt owed the Estate by Unger had been discharged. The Estate appeals the trial court's holding.

The Estate contends the probate court erred in holding it had no jurisdiction because 11 U.S.C. § 523(a)(4) of the Bankruptcy Code exempts from discharge any debt for fraud or defalcation which results from the debtor acting in a fiduciary capacity, an embezzlement, or a larceny. In sum, the Estate claims Unger improperly converted estate funds without any probate court order, and therefore was not released from liability to the Estate under § 523(a)(4). The Estate overlooks other pertinent provisions in § 523.

Section 523(a)(3)(B) of the Bankruptcy Code reads in relevant part as follows:

> (a) *A discharge under* section 727, 1141, 1228(a), 1228 (b), or 1328(b) of *this title does not discharge an individual debtor from any debt —*
>
> * * *
>
> (3) neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit —
>
> * * *
>
> (B) *if such debt is of a kind specified in paragraph* (2), (*4*), or (6) *of this subsection,* timely filing of a proof of claim and timely requests for a determination of dischargeability of such debt under one of such paragraphs, *unless* such creditor had notice or actual knowledge of the case in time for such timely filing and request;
>
> * * *

In addition, § 523(c)(1) is relevant to the Estate's argument and that provision provides as follows:

> (c)(1) Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom

such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section.

■ As discussed previously, the Estate argues Unger fraudulently obtained funds as a result of fraud or misconduct as a fiduciary from the McKinney Estate and these funds Unger owes the estate is a nondischarged debt under § 523(a)(4) of the Bankruptcy Code. However, as is evident from § 523(a)(3)(B) above, a § 523(a)(4) debt can still be discharged if the creditor, the Estate here, obtained notice or actual knowledge of the filing of the debtor's, Unger's, bankruptcy petition in time to file a timely proof of claim. Having such knowledge, the creditor Estate was required under § 523(c)(1) to request the court to find that the § 523(a)(4) debt was to be excepted from discharge.

In reviewing the record, it is clear that David McKinney was well aware of Unger's bankruptcy petition because, as an individual-listed creditor, he was sent notice of the proceeding. In addition, David McKinney and the Estate's attorney, George Mason, Jr., knew Unger had filed a claim for attorney's fees on January 29, 1988 and March 4, 1988, and both learned by letter dated April 1, 1988 that Unger was seeking a legal fee in the amount of $21,893.90. In that same letter, Unger related that the Estate had $134,715.58 in receipts and $110,796.29 in disbursements, leaving a *balance of $23,379.29*. After subtracting the amount of fees on which he claimed a lien, Unger wrote $1,485.39 would remain, and he requested instructions regarding whom he should deliver the remaining amount to. No response was made.

However, on May 19, 1988, David McKinney went to the bank where the Estate's account was held and removed Unger's signature from the account, replaced it with his own and took possession of the balance in the account, *which was only $1,819.15*.

On March 31, 1989, McKinney wrote a letter to Unger's former law partner, Ian Vickery, acknowledging the fact that he was aware of Unger's bankruptcy. McKinney signed the letter, "David B. McKinney, Administrator, Estate of Mary D. McKinney." In sum, even though David McKinney had actual knowledge of Unger having filed his bankruptcy petition and knew that

Unger claimed more than $21,000.00 in attorney's fees, neither McKinney nor the Estate's attorney filed an objection or motion with the bankruptcy court. The Estate rejoins that while McKinney may have had actual knowledge of Unger's bankruptcy proceeding, that fact alone was insufficient to require McKinney to file a proof of claim in that proceeding. The Estate then asserts a "provable debt" must also be shown to exist before the Estate was obliged to appear in the bankruptcy action. The Estate is correct that a provable *claim* must exist, but "claim" in relevant part is defined in 11 U.S.C. § 101(4)(A) (1988) to mean the following:

> [R]ight to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

We further note that "debt" as defined under the Bankruptcy Code means liability on a claim. 11 U.S.C. § 101(11) (1988).

Here, a legal, disputed and unliquidated claim existed between Unger and the Estate, and that being so, the Estate, having knowledge of such claim and Unger's bankruptcy petition, was required to file a proof of claim and ask any debt Unger owed the Estate to be excepted from discharge. The Estate simply failed to do so. Accordingly, we agree with the probate court's decision that any debt Unger owed the Estate was discharged under the bankruptcy proceedings. As a consequence, the probate court was preempted from ordering Unger to place the disputed funds into the court's registry or finding Unger in contempt for having failed to do so. *See Wood* v. *Goodson, Judge*, 258 Ark. 196, 485 S.W.2d 213 (1972).

In conclusion, we feel obliged to point out Mr. Unger's misconduct in handling estate funds and obtaining payment of attorney's fees in this matter. In oral argument, this court first became aware that Mr. Unger failed to place monies belonging to the Estate in the Estate's bank account, but instead placed such funds in his trust account. Although attorney's fees were a disputed matter, Unger paid himself those fees from Estate funds without the probate court's approval. Although we hold the Estate failed to pursue its claim against Unger in the manner required by law, we do not by doing so condone Mr. Unger's

misconduct. Mr. Unger's attorney's license has already been surrendered for similar misconduct. *In Re John William Unger*, 303 Ark. 743, 796 S.W.2d 586 (1990).